**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Huey Brock, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| vs. | ) | |
| | ) | |
| Jim Hipner, LLC, Robert Lopez, Does 1 | ) | |
| Through 50, Inclusive, | ) | Case No. 4-15-cv-84 |
| | ) | |
| Defendants. | ) | |

## I.  BACKGROUND

### A.  The accident and the partial settlement

On March 31, 2011, Huey Brock ("Brock") was involved in a car accident with a truck owned by Jim Hipner, LLC ("Hipner") and operated by Robert Lopez, Hipner's employee.  As a result of injuries sustained in the accident, Brock became quadriplegic.  At the time of the accident, Hipner had a $1 million primary insurance policy with Great West Casualty Company ("Great West").  Hipner also carried a $2 million excess insurance policy with Century Surety Company ("Century").  Prior to any litigation, Brock, Hipner, Lopez, and Great West entered into a settlement agreement dated March 23, 2013 (Docket No. 9-1), under which Great West agreed to pay Brock the policy limit of $1 million.   The motion currently before the court focuses upon the effect of this agreement in relation to Brock's current negligence claim against Hipner and Lopez.

The settlement agreement, in pertinent part, provides:

SETTLEMENT AGREEMENT AND RELEASE

WHEREAS a motor vehicle collision occurred on March 31, 2011, at or about 6:15 p.m., on US Highway 2 east of Williston, North Dakota, involving multiple motor vehicles, including one owned by Jim Hipner, LLC,

WHEREAS Huey Brock sustained injuries as a result of that accident, which include, but are not limited to: Quadriplegia,

WHEREAS at the time, Jim Hipner LLC had a policy of liability insurance coverage providing $1,000,000.00 per occurrence combined single policy limit coverage with Great West Insurance Company to indemnify it and, furthermore, had a $2,000,000.00 excess or umbrella insurance policy with Century Surety Company, which would indemnify him to said amount.

* * * *

WHEREAS Huey Brock claims that the amount needed to fully compensate him for his damages, injuries and losses exceeds the sum of the liability of both the Great West Insurance Company policy and the Century Surety Company policy,

WHEREAS Huey Brock and Jim Hipner LLC are desirous of resolving that portion of Huey Brock's claim that involves the financial responsibility of Great West Insurance Company, and of limiting the financial exposure of Jim Hipner LLC, its owners, agents, and employees (including Robert Lopez) on the basis of an agreement consistent with Drake v. Ryan, 514 N.W.2d 786 (Minn. 1994), allowing Huey Brock to take the $1,000,000.00 policy limit of the liability insurance coverage from Great West Insurance Company and preserving his claims related to any and all coverage provided by Century Surety Company,

WHEREAS Huey Brock expressly reserves any and all rights and claims he has against Jim Hipner LLC and Robert Lopez to the extent of any insurance coverage provided by the Century Surety Company policy, and accordingly, this Settlement Agreement and Release does not have the effect of a general release,

NOW THEREFORE in consideration of the payment of the policy limit of $1,000,000.00 by Great West Insurance Company on behalf of Jim Hipner LLC and Robert Lopez, the receipt of which is acknowledged, Huey Brock agrees as follows:

1.      Settlement.  Huey Brock and Jim Hipner LLC agree that the reasonable value of all of Huey Brock's claims for damages growing out of the injuries sustained in the motor vehicle collision of March 31, 2011, are in an amount in excess of $3,000,000.00.  Huey Brock stipulates and agrees to settle a portion of his claim against Jim Hipner LLC and Robert Lopez for a total of the policy limit of $1,000,000.00, pursuant to the principles of Drake v. Ryan, 514 N.W.2d 786 (Minn. 1994), and agrees that said damages will be collectable only from applicable liability insurance coverage, and not from the personal assets of Jim Hipner LLC, its owners, agents and employees, including Robert Lopez.  In the event that a judgment is entered upon Huey Brock's claims, Huey Brock will only seek to satisfy such judgment from Century Surety Company or any other liability insurance company providing coverage to Jim Hipner LLC or Robert Lopez, and any such judgment is explicitly not satisfiable by attachment of, nor shall it become a lien upon, any assets or property of Jim

Hipner LLC or Robert Lopez.

2.  Release.  Huey Brock, upon payment of the $1,000,000.00 liability limits by Great West Insurance Company, hereby releases Jim Hipner LLC, its owners, employees (including Robert Lopez), or any other person or entity affiliated with Jim Hipner LLC, and Great West Insurance Company, from any and all liability arising out of the injures and damages which he sustained as a result of the motor vehicle collision of March 31, 2011, on US Highway 2 east of Williston, North Dakota, except as such claims are preserved herein and satisfiable out of liability insurance coverage provided by Century Surety Company or any other liability insurance company.

        * * * *

4.  Limitation of Claim Against Jim Hipner LLC and Robert Lopez.  Huey Brock agrees to limit his claim against Jim Hipner LLC, its owners, agents or employees, including Robert Lopez, to the available liability insurance coverage from Century Surety Company and not to pursue Jim Hipner LLC or Robert Lopez for any personal assets.  Huey Brock expressly agrees and acknowledges that Jim Hipner LLC, its owners, agents, or employees, including Robert Lopez, are not personally exposed to any liability to Huey Brock beyond insurance coverage available from Century Surety Company and Huey Brock will only seek to satisfy any judgment he obtains against Jim Hipner LLC or Robert Lopez by means of insurance coverage available to them.  However, if a verdict or judgment is obtained by Huey Brock in excess of the insurance coverage available from Century Surety Company, Huey Brock will seek to satisfy any judgment against Century Surety Company for any and all amounts in excess of the umbrella or excess insurance coverage amount.

5.  All Other Claims Preserved.  Consistent with the above terms, Huey Brock preserves every other claim, against every person, by this agreement.  It is agreed that Huey Brock is not fully compensated by the payment of $1,000,000.00 by Great West Insurance Company for the injures which he received in this collision.

6.  Assignment.  Jim Hipner LLC hereby assigns to Huey Brock its right to indemnity from Century Surety Company, and all other rights and/or claims against Century Surety Company, or any other liability insurance company providing coverage to Jim Hipner LLC, including but not limited to claims for breach of the covenant of good faith and fair dealings, bad faith, breach of contract, and/or for the amount of this settlement, together with its right to recover attorney's fees, costs and expenses in pursuing his claim and coverage under the Century Surety Company policy of insurance.

(Docket No. 9-1).

## B.    The two other cases

Following the settlement agreement, three separate litigations ensued before this court, including this case.  The current motion requires examination of the two other cases.

### 1.    Century Surety Co. v. Jim Hipner LLC, Case No. 4-12-cv-164

On December 4, 2012, Century filed a declaratory judgment action seeking a declaration it had no obligation to defend or indemnify Hipner in connection with any claims relating to the accident.  Century Surety Co. v. Hipner, LLC, No. 4-12-cv-164, 2015 WL 11143135 (D.N.D. April 24, 2015).  Both parties moved for summary judgment.  Id. at *1.  The court granted Century's motion, in part, on April 25, 2015.  In the order, the court concluded Wyoming law controlled interpretation of the insurance contract between Century and Hipner.  Id. at **4-7.  The court also concluded Hipner complied with the notice requirement necessary to trigger insurance coverage. Id. at **8-10.

With respect to whether Century had a duty to defend and indemnify the defendants, the court concluded that, given the "ultimate net loss" provision of its policy, its coverage was not triggered until liability and the amount of damages were determined by either a settlement or a judgment in excess of the underlying policy limits.  And, because there was neither, the court concluded there was no present duty to defend or indemnify.  Id. at *12 ("There is arguably no right of action or claim under the excess insurer's policy until such time as liability and the amount of damages have been determined by reason of a settlement or a judgment in excess of the underlying policy limits.").  The court then limited its declaration to the following:

> [Century] is not obligated to defend or indemnify Hipner LLC or Lopez at this point in connection with any claims arising out of or relating to the accident that occurred on March 31, 2011.  However, in the event a justiciable controversy exists in the future, both the primary carrier and the excess carrier may be obligated to defend or indemnify.

Id. at *13.

　　While there is some language in the court's decision which suggests that the court read the settlement agreement as Brock having released defendants from all liability whatsoever with respect all claims, there are other statements, including that set forth above, where the court notes the possibility of Brock still being able to file an action against them and that Century may be obligated to provide both a defense and indemnity. The court will return to this later. Suffice it to say now, however, that anything the court stated about the extent of the release was not necessary to the limited declaration that Century had no present duty to defend or indemnify since there was neither a judgment of liability on the part of the defendants, much less an action filed against them seeking a determination of their liability, or a triggering settlement.

　　Even though Century was the prevailing party with respect to the court's limited declaration, it appealed that part of the court's decision that Hipner had complied with the notice provision under its policy. On appeal, the Eighth Circuit Court of Appeals certified questions to the Wyoming Supreme Court regarding the effect of the notice requirement in the insurance contract between Century and Hipner, which were answered in Century Surety Co. v. Jim Hipner, LLC, 377 P.3d 784 (Wyo. 2016). After this response, the Eighth Circuit affirmed this court's judgment, albeit on the alternative grounds Century had not shown any prejudice resulting from Hipner's failure to provide Century with timely notice of the accident. Century Surety Co. v. Jim Hipner, LLC, 842 F.3d 606, 612 (8th Cir. 2016).

## 2. Brock v. Century Surety Co., Case No. 4-14-cv-156

　　On December 4, 2014, Brock filed an action against Century, as assignee of Hipner's rights under the settlement agreement, for breach of contract and tortuous breach of the implied covenant

of good faith and fair dealing. (Docket No. 1). Brock alleged Century, despite having proper notice of the accident, actively sought to deny coverage in bath faith. Century filed a motion to dismiss for failure to state a claim. (Docket No. 17). Century argued Brock's claims were compulsory counterclaims that must have been asserted in the declaratory action and, in the alternative, that the settlement agreement released the defendants from all liability. On September 16, 2015, the court denied Century's motion to dismiss. (Docket No. 30). The court concluded Brock's claims were not compulsory counterclaims because the claims operated on facts distinct, and subsequent to, those facts implicated in the previous declaratory action. (Id. at pp. 9-10). With regard to whether the settlement agreement precluded any liability on the part of the defendants in this action, the court stated:

> Century Surety next contends that because Brock released Hipner LLC from all liability for the underlying accident in the underlying settlement agreement, Brock can no longer sue Hipner LLC for that liability and potentially trigger excess coverage under the Century Surety umbrella policy. See Docket No. 25. Brock argues that whether Hipner LLC has been released of all liability is immaterial for purposes of Brock's bad faith claims against Century Surety. See Docket No. 27. The Court notes that liability regarding the motor vehicle accident is the crux of Case No. 4:15-cv-84. Because a jury or a court will adjudicate liability and liability-related issues in Case No. 4:15-cv-84, as well as other disputed factual or legal issues, including the effect of the release, the Court finds that it is premature to decide the implications of the release in this particular case at this time. Accordingly, the Court will defer ruling on the legal effects of the release in this case until it has been fully addressed and adjudicated in Case No. 4:15-cv-84.

(Id. at p. 10). Based on these conclusions, the court denied Century's motion to dismiss. (Id.).

## C.    **This action**

On June 23, 2015, Brock initiated this action alleging negligence against Hipner, Lopez, and Does 1-50 (collectively "defendants"). (Docket No. 1). Without answering, defendants filed the motion currently before the court, moving to dismiss Brock's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (Docket No. 7). The motion

was held in abeyance while the appeal in Century's declaratory action was being decided. With the resolution of that appeal, the motion is now back before the court.

## II.    DISCUSSION

### A.    Introduction

The standard for whether to grant a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is well-established. Under Rule 12(b)(6), the court must accept all factual allegations set forth in the complaint as true. Although the court may generally look only to those allegations set forth in the complaint, "the district court may sometimes consider materials outside the pleadings, such as materials that are necessarily embraced by the pleadings and exhibits attached to the complaint." Mattes v. AVC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)).

Defendants advance three arguments for why the complaint should be dismissed. First, they contend that this court decided in Century's declaratory judgment action that Brock did not reserve any claim against them under the settlement agreement and that he is now collaterally estopped from contending otherwise. Second, even if the court did not conclude that Brock had released all of his claims against defendants, they make that argument now. Third, defendants argue that, even if Brock reserved a claim, the reservation is void under North Dakota law.

Technically speaking, defendants are "jumping the gun" in raising these issues by way of a Rule 12(b)(6) motion. Nowhere in the complaint is the settlement agreement mentioned. Further, release and collateral estoppel are affirmative defenses that normally must be asserted in an answer. Nominally, the issue now is whether Brock's complaint states a claim as a matter of law, which it clearly does, at least on its face.

That being said, in response to defendants' motion, Brock has not disputed that the settlement agreement was entered into nor has he objected to the court's consideration of defendants' release arguments, choosing instead to address them on the merits. Consequently, the court will address them now. Also, the court will address the collateral estoppel issue, even though it was not raised by defendants until their reply brief, since it can be resolved in Brock's favor.[1]

## B.    Brock is not collaterally estopped from bringing this action

Defendants argue collateral estoppel applies to Brock's current action because, according to them, the court's decision in the earlier declaratory judgment action held Brock released all of his claims against Hipner and Lopez under the Settlement Agreement. Under North Dakota law, collateral estoppel, or issue preclusion, "bars relitigation of issues which were necessarily litigated and decided, or which by implication must have been litigated and decided, in a prior action." Riverwood Commercial Park, L.L.C. v. Standard Oil Co., Inc., 2007 ND 36, ¶ 20, 729 N.W.2d 201. An issue was "necessarily decided" if "'the determination of the former action could not have been made without determining' the issue in question." Id. at ¶ 21 (quoting Knutson v. Ekren, 72 N.D. 118, 125, 5 N.W.2d 74, 78 (1942)). This principle allows revisiting of incidental or collateral determinations of nonessential issues in subsequent litigation. Id.

Here, defendants' collateral estoppel argument fails for two reasons. What the court ultimately concluded in the declaratory action was Century was not then obligated to defend or indemnify defendants because Brock had yet to acquire a judgment of liability or settlement in

---

[1] Defendants did not raise the collateral estoppel issue in their initial briefing, instead waiting until their reply brief to raise the issue. Courts are not generally under any obligation to address issues raised for the first time in reply briefing. See Powell v. St. Francois Cty., No. 4:14-cv-1230, 2016 WL 695674 at *2 (E.D. Mo. Feb. 19, 2016) (stating "a court generally will not consider an issue raised for the first time in a reply brief."); see also Kirt v. Fashion Bug # 3253, Inc., 479 F. Supp.2d 938, 948 n.4 (N.D. Iowa 2007) (stating "[r]aising a new issue in a reply brief, however, generally does not require the court to consider that issue.").

excess of the primary insurance binding upon Century, which the court concluded was a condition precedent to Century's obligation to defend given the "ultimate net loss" provision of its policy. Century Surety Co. v. Jim Hipner, LLC, 2015 WL 11143135, at *12.[2] What the court did not finally declare was that Century was under no obligation to defend or indemnify because Brock had failed to reserve any claim against defendants. The court repeatedly noted that future litigation could possibly provide a triggering judgment. See id. at p. 24 (stating "Century Surety is not legally obligated *at this point in time* to defend and indemnify" the Defendants); id. at p. 25 (stating *"in the event a justiciable controversy exists in the future*, both the primary carrier and the excess carrier may be obligated to defend or indemnify.") (emphasis added). That future litigation is now currently before the court.[3]

Second, to the extent the court's prior order in the declaratory judgment action can be read as opining on the legal effect of the settlement agreement in terms of the extent of any release, that discussion was not necessary for the final conclusion reached by the court. This is because, rather than broadly declaring that the settlement agreement foreclosed any duty on the part of Century to defend or indemnify defendants, the court limited its decision to declaring only that Century had no present duty because one had not yet been triggered under the "ultimate net loss" provision of the policy. As a result, the legal effect of the settlement agreement in terms of what is at issue in this case was not of necessity decided in the prior litigation, rendering collateral estoppel inapplicable.

---

[2] Although Century appealed another portion of that order, neither party appealed this specific conclusion.

[3] Some six months after the court issued its decision in the declaratory action, it stated the following in its order denying Century's motion to dismiss in the bad faith case initiated by Brock discussed earlier: "the Court will defer ruling on the legal effects of the [Settlement Agreement] in this case until it has been fully addressed and adjudicated in Case No. 4:15-cv-84." (Docket No. 50, p. 10). This deferment to future litigation would have been unnecessary had the court already decided the issue, as defendants argue.

**C.**    **Defendants are not entitled to a Rule 12(b)(6) dismissal for failure to state a claim based on their proffered interpretation of the settlement agreement**

Defendants next argue that Brock's complaint must be dismissed because Brock did not reserve a viable claim against defendants under the Settlement Agreement. In support, they cite to particular phrases in the agreement that they contend fully released them from all claims arising from the accident.[4] Brock disagrees, citing to other provisions of the agreement that, under his interpretation, reserved a claim against the defendants to the extent of available insurance that was not released.

These arguments require the court to interpret the settlement agreement. In North Dakota:

> The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. Contract terms are read as a whole to determine the intentions of the parties and are given their plain, ordinary, and usual meaning. Each term of a contract is construed to avoid rendering other terms meaningless. A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense. Where the language of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone, and a court will not resort to construction where the intent of the parties is expressed in clear, unambiguous language. Extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity.

Schwarz v. Gierke, 2010 ND 166, ¶ 16, 788 N.W.2d 302 (internal citations, quotations, brackets, and punctuation omitted).

Starting first with section 1 of the agreement's operative provisions, Brock "stipulate[d] and agree[d] to settle *a portion of his claim*" against defendants in exchange for the $1 million insurance policy with Great West. (emphasis added). The same provision then adds that the partial settlement

---

[4] The court notes this argument is contrary to Hipner's prior position before this court in Case No. 4:12-cv-164. In that case, Brock, in his briefing, argued the settlement agreement did not fully release the defendants from all liability emanating from the accident. (Docket No. 53 pp. 6-8). Hipner incorporated Brock's arguments into its own briefing, (Docket No. 58), thereby adopting a position at odds with that which he now advances. Given what the court now decides, it need not address whether Hipner is barred under the doctrine of judicial estoppel from taking a position different from what it had urged the court take in Case No. 4:12-cv-164.

being made was "pursuant to the principles of Drake v. Ryan, 514 N.W.2d 785 (Minn. 1994)[.]"

A Drake settlement agreement (at least as relevant to this case) provides a mechanism for a an injured party, an alleged tortfeasor with both primary and excess coverage, and the primary insurer to fully settle a portion of the injured party's claim up to the limits of the primary liability insurance but allows the injured party to pursue the tortfeasor for additional amounts but limited to the coverage that is available from the excess carrier. See id.; see also Stan Koch & Sons Trucking, Inc. v. Great W. Cas. Co., 517 F.3d 1032, 1037 n.5 (8th Cir. 2008) ("A Drake v. Ryan settlement agreement arises out of the Minnesota Supreme Court's decision in Drake v. Ryan, 514 N.W.2d 785 (Minn.1994), holding that a plaintiff *may fully release a defendant and his primary liability insurer up to the limits of the primary liability coverage* but expressly retain the right to pursue his or her claims against the defendant for additional damages up to the limits of the defendant's excess liability coverage.") (internal quotations and brackets omitted and emphasis added). Here, the explicit reference to Drake, when coupled with the statement that only "*a  portion of his claim*" was being settled, conveys the intent of reserving a claim against the defendants for amounts in excess of the limits of the primary policy.

Moving down to section 2, Brock, in exchange for the payment of the $1 million, agreed to release defendants "from any and all liability arising out of the injuries and damages which he sustained as a result [of the accident]. . . , *except as such claims are preserved herein* and satisfiable" out of any insurance policies, including the excess insurance policy with Century.  (emphasis added). Then, in section 4, Brock agreed only to "*limit his claim against Jim Hipner LLC, its owners, agents or employees, including Robert Lopez to the available liability insurance from [Century]*," which the paragraph further made clear meant he would not pursue any personal assets of defendants and

would "only seek to satisfy *any judgment he obtains against Jim Hipner LLC or Robert Lopez* by means of insurance coverage available to them." (emphasis added). Following that, there is an additional reservation of claims in section 5, whereby "Brock preserves every other claim, against *every person*, by this agreement . . ." to the extent consistent with the previous terms of the settlement agreement.

Finally, in addition to the operative provisions of the agreement, there are the preceding recitals in which the parties further expressed what they intended. In the seventh recital, the parties stated that they were desirous of "resolving *that potion of* Huey Brock's claim that involves the financial responsibility of Great West Insurance Company and *limiting* the financial exposure of [defendants] . . ." on the basis of an agreement consistent with that set forth in <u>Drake</u>, such that it would permit Brock to obtain the primary insurance coverage and "*preserve his claims related* to any and all coverage provided by Century Surety Company[.]" (emphasis added). Then, in the eighth recital, the parties stated:

> WHEREAS Huey Brock *expressly reserves any and all rights and claims he has against Jim Hipner LLC and Robert Lopez to the extent of any insurance coverage provided by the Century Surety Company policy*, and accordingly, this Settlement Agreement and Release *does not have the effect of a general release*[.]

(emphasis added).

Considering the entirety of the settlement agreement and giving effect to all of its provisions as this court must, Brock has a plausible argument that what the parties agreed to was this: Brock fully released and settled a part of his claim against defendants and the primary insurance carrier but only up to the amount of the primary insurance coverage. Brock reserved a claim against defendants for any amounts in excess of the policy limits paid by the primary insurer and, as to his reserved claim, he agreed only to look to the proceeds from Century's excess coverage in satisfaction of any

judgment and not execute upon any of defendants' other personal assets. In other words, even though inartfully stated, Brock provided a full release of liability to defendants and the primary carrier for a part of his claim but, as to the other part, he only provided defendants a covenant not to execute.

In arguing to the contrary, defendants contend the salient provisions of the settlement agreement are where Brock released them from "any and all liability arising out of the injuries and damages which he sustained as a result of the accident . . . " and the portion that absolves defendants from any further personal exposure. While that language, standing alone, supports their interpretation, an interpretation adopting it as controlling would, arguably, render numerous other provisions within the agreement superfluous. These include:

(1)     the remainder of the sentence in which the words "any and all liability arising out of the injuries and damages which he sustained as a result of the accident" appears beginning with the word "except" and followed by "such claims are preserved herein and satisfiable out of liability insurance coverage provided by Century Surety Company[;]"

(2)     the mention, no less than five times, of a potential judgment against defendants, since no judgment could be obtained if there was a complete release as defendants contend;

(3)     the language that amounts to a covenant not to execute against the defendants' other personal assets, which is unnecessary if there was a complete and full release of all claims;

(4)     the other language set forth in italics above, including that referencing the settlement of a "portion" of Brock's claim.

Under North Dakota law, the court is not permitted to read out of an agreement language rendered superfluous by one party's interpretation if a reconciliatory interpretation is possible, which, arguably, may be the case here. See, e.g., Tank v. Citation Oil & Gas Corp. 2014 ND 123, ¶ 28, 848 ND 691; Schwarz v. Gierke, supra.

Further supporting Brock's argument are decisions from other courts that have interpreted settlements agreements with somewhat comparable language as reserving an unreleased claim or portion of a claim after applying similar principles of contract construction. See, e.g., Dowse v. Southern Gaur. Ins. Co., 588 S.E.2d 334, 236-39 (Ga. Ct. App. 2003) (concluding that plaintiff had not fully released all of his claims after considering the settlement agreement as a whole and giving effect to the intention of the parties and noting also "that there is no full and complete release of claims where some claims are specifically reserved by the parties."); Drake, supra (discussed below); Loy v. Bunderson, 320 N.W.2d 175, 186-92 (Wis. 1982) (stating that what parties intended by the totality of the language of the settlement agreement with respect to its treatment of the tortfeasor was an agreement not to sue despite the use of the word "release," but that, even if there was a release, it was not a full and complete such that it foreclosed a direct claim against the insurer providing secondary coverage); Deblon v. Beaton, 247 A.2d 172, 173-74 (N.J. Sup. Ct. 1968) (concluding that, while certain language of a covenant not to sue appeared to release defendants generally, the agreement when read as whole revealed an intent to release one insurer and defendants to the extent of their personal assets but retain a claim that could be satisfied from the remaining insurance coverage); see also Brownstone Homes Condominium Ass'n v. Brownstone Forest Heights, LLC, 363 P.3d 467, 478 (Or. 2015) (en banc) (noting that a settlement agreement needs to be read as whole to determine whether it has the effect of completely extinguishing all further

-14-

liability).

Of these cases, particularly relevant is <u>Drake</u>, given that the settlement agreement in that case was expressly relied upon by Brock and defendants in crafting their agreement. As recounted in the Minnesota Supreme Court's opinion, the settlement agreement in that case read, in pertinent part, as follows:

> 1. Dairyland hereby tenders $20,000.00 in satisfaction of $30,000.00 worth of the outstanding claim of plaintiffs against its insureds, defendant James Patrick Ryan and Richard Eugene Ryan.
>
> 2. Plaintiffs hereby accept the $20,000.00 from Dairyland, and agree that the receipt of said $20,000.00 will operate as a partial satisfaction of any claim plaintiffs may have against defendants to the extent of the first $30,000.00 which may be adjudged against them, and further, that defendants will have no personal liability to plaintiffs and that the $20,000.00 payment will operate as a satisfaction of all claims against defendants in excess of the limit, if any, of the State Farm Insurance Policy * * * *
>
> 3. The receipt of the $20,000.00 from Dairyland further shall operate as a release of all obligations of Dairyland under its policy of insurance, and in the event of any judgment which may be obtained by plaintiffs against defendants, $30,000.00 shall be credited against any such judgment for the alleged damages of plaintiffs.
>
> 4. Plaintiffs specifically reserve any and all claims which plaintiffs may have against defendants up to the limit of State Farm's policy, if any, and plaintiffs specifically agree that they will satisfy any judgment which they may recover against defendants in excess of $30,000.00, only out of the proceeds of the policy issued by State Farm, if any.
>
> 5. It is the intent of the parties that this agreement shall be governed and construed in accordance with the principles and rules established in the case of <u>Teigen v. Jelco of Wisconsin</u>, Inc., 124 Wis.2d 1, 367 N.W.2d 806 (1985) and <u>Loy v. Bunderson</u>, 107 Wis.2d 400, 320 N.W.2d 175 (1982).
>
> 6. Dairyland hereby acknowledges that it will provide reasonable notice to State Farm Insurance of the existence of this agreement.
>
> 7. Dairyland hereby acknowledges and agrees that it will not request repayment of this credit and/or advance payment ($20,000.00) from plaintiffs in the event that a future trial should determine that defendants are not liable to plaintiffs for damages.
>
> 8. It is the understanding of the parties to this agreement that the joint and several liability of the defendants identified in the civil action presently pending shall not be affected in any way, manner or form by this agreement.

9.  The parties hereby acknowledge and agree that this document should *not* be construed as a Pierringer Release, and hereby acknowledge and agree that this document shall not have the legal effect of a Pierringer Release or a general release.

10.  The parties hereby acknowledge and agree that if it is ultimately determined that this agreement may not be governed and construed in accordance with <u>Teigen</u>, <u>supra</u>, and <u>Loy</u>, <u>supra</u>, plaintiffs nonetheless forever forego any action of any kind arising out of the December 21, 1988, accident against Dairyland and against defendants, except to the extent of coverage provided to defendant James Patrick Ryan by State Farm Insurance.

514 N.W.2d at 784-85.

Even though certain language in the settlement agreement in <u>Drake</u> could be read as the plaintiff having granted the defendant insured a full release of his entire claim, the Minnesota court of appeals concluded that only a partial release had been given when the agreement was considered in its entirety.  Relying in part upon a New Jersey case cited earlier that had reached the same conclusion with respect to a similar agreement, the court of appeals stated:

> The excess insurer contends, through Ryan, that the release warrants dismissal of its insured from the negligence action and that a judgment against its insured, requisite for garnishment, thus, can never be obtained. In so arguing, State Farm's reliance on language in the release "that defendants will have no personal liability to plaintiffs" is not well-founded. It is an established principle that courts "construe a contract as a whole and attempt to harmonize all clauses of the contract." <u>Chergosky v. Crosstown Bell, Inc.</u>, 463 N.W.2d 522, 525 (Minn.1990). For example, in <u>Deblon v. Beaton</u>, 103 N.J.Super. 345, 247 A.2d 172, 174 (N.J.Super.Ct.Law Div.1968), the court stated:

>> Taken out of context, * * * certain clauses appear to release [defendants] generally, so it is argued that the result is to preclude any claims against [the excess insurer]. The entire instrument, however, clearly reveals an intention to release [defendants] only to the extent of their personal assets and their [primary] insurance coverage, while retaining a claim to their [excess] coverage.

> Similarly, in this case, the agreement as a whole demonstrates an intent to confine any additional recovery by the Drakes to the $50,000 State Farm policy, and only to the extent the judgment subsequently obtained against the Ryans exceeds $30,000. The following provisions of the agreement evidence this intent:

>> 2.  Plaintiffs hereby accept the $20,000.00 from Dairyland, and agree that the receipt of said $20,000.00 will operate as a *partial satisfaction* of any claim plaintiffs may have against defendants to the extent of the first $30,000.00 *which may be adjudged against them*, and further, that defendants will have no personal

> liability to plaintiffs and that the $20,000.00 payment will operate as a satisfaction of all claims against defendants in excess of the limit, if any, of the State Farm Insurance policy.
>
> 3. [I]n the event of any judgment which may be obtained by plaintiffs *against* defendants, $30,000.00 shall be credited against any such judgment for the alleged damages of plaintiffs.
>
> 4. Plaintiffs specifically reserve any and all claims which plaintiffs may have *against defendants* up to the limit of State Farm's policy, if any, and plaintiffs specifically agree that they will satisfy *any judgment which they may recover against defendants* in excess of $30,000.00, only out of the proceeds of the policy issued by State Farm, if any.

(Emphasis added.) From this language, it is clear that, contrary to State Farm's assertion, the agreement does not absolve Ryan of liability. Rather, it merely serves to protect his personal assets by limiting satisfaction of any judgment against him to insurance coverage limits.

498 N.W.2d at 32. Then, on appeal, the Minnesota Supreme Court affirmed this reading of the settlement agreement, stating:

> The first question is whether the agreement fully and finally releases James Ryan from all liability. We conclude that it does not. In several of the agreement's provisions, the plaintiffs specifically reserve their claims against James Ryan up to the limits of the State Farm policy. As the court of appeals recognized, in construing the agreement as a whole, it is evident that rather than fully releasing James Ryan, the agreement merely served "to protect his personal assets by limiting satisfaction of any judgment against him to the insurance coverage limits." Drake, 498 N.W.2d at 32.

514 N.W.2d at 789. In terms of the construction of the settlement agreement in this case, the reasoning of both the Minnesota appellate courts supports the conclusion that Brock's proffered interpretation is at least plausible.

Defendants disagree. They contend the settlement agreement is comparable to the one considered by the North Dakota Supreme Court in Hanneman v. Cont'l W. Ins. Co., 1998 ND 46, 575 N.W.2d 445. In that case, the Hannemans (the alleged victims) and Lee Kurry (the insured under a contract with Continental Western Insurance Company) entered into an agreement, which stated:

> All other claims, except as to Continental Western Insurance Company's insurance coverage, are hereby released by the Hannemans, including, but not limited to any claim for personal liability by Lee Kurry and including any claim for damages in excess of insurance coverage. The claim against Continental Western Insurance Company is the only claim being reserved by Hannemans. If it is determined that there is no coverage by Continental Western Insurance Company for Lee Kurry, then all claims by Hannemans against Lee Kurry are hereby extinguished.

Id. at ¶ 43 (emphasis contained in original). The North Dakota Supreme Court interpreted this language as completely releasing any claim of the Hannemans against Kurry. Id. at ¶ 45. The Hanneman agreement, however, is arguably distinguishable from the one under consideration here. Whereas that agreement contained absolute language releasing the Hannemans and stating the only claim being reserved was a claim against the tortfeasor's insurer, the settlement agreement here contains much more limited language that can plausibly be interpreted as releasing, only in part, Brock's claim against defendants. To the extent defendants parse snippets of language from the settlement agreement in this case to analogize with the Hanneman agreement, they arguably again do so at the expense of rendering contrary language within the settlement agreement here meaningless.

In summary, after applying the relevant North Dakota rules of contract construction, the court cannot conclude that the settlement agreement unambiguously provided defendants a full and complete release of all claims such that they are entitled at this stage to a dismissal of this action.

**D.    The North Dakota Supreme Court would conclude that Brock's reserved claim is enforceable against Century**

**1.    Introduction**

Recognizing the court might ultimately interpret the settlement agreement as having partially reserved a viable claim, defendants argue that a partial reservation coupled with a promise not to execute against a tortfeasor's personal assets, similar to that permitted in Drake, is invalid under

North Dakota law.  Defendants have not pointed to any decision by the North Dakota Supreme Court that has explicitly so held, however.[5]

In the absence of controlling North Dakota precedent, the court's obligation is not to decide what it thinks the law should be but rather to predict how the North Dakota Supreme Court would resolve the question.  Hoff v. Elkhorn Bar, 613 F. Supp. 2d 1146, 1149 (D.N.D. 2009) ("In the absence of controlling North Dakota law, the Court is obligated to predict what North Dakota law is based upon 'relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data.'") (quoting Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005)).

Also, to be clear, the question here is not whether a Drake settlement in all of its features is valid in North Dakota.  Rather, it is whether the North Dakota Supreme Court would conclude that, when a tortfeasor has both primary and excess coverage, an injured party can under North Dakota law: (1) fully release a tortfeasor and tortfeasor's primary insurance carrier for an amount equal to the limits of the primary carrier *in exchange for payment of those limits by the primary carrier*; (2) reserve a claim against the tortfeasor for any amounts plaintiff is claiming in excess of the primary limits; and (3) agree to limit the recovery on the reserved claim to the proceeds of the excess coverage backed by an agreement not to execute upon the tortfeasor's other personal assets.  While a "true" Drake settlement involves most of the same features, there is one critical difference.  The settlement agreement in Drake (like the one in the Wisconsin case of Loy referenced in the Drake

_____

[5] Defendants argue the court's prior order in Century Surety Co. v. Jim Hipner LLC et al. Case No. 4-12-cv-164 held North Dakota law does not recognize Drake settlement agreements. While the court made that statement, it was in the sense that there was and still is no decision by the North Dakota Supreme Court deciding the question one way or the other.  The court did not itself render a prediction as to what the North Dakota Supreme Court would decide. Further, as will be discussed in a moment, not all of the features of the settlement in Drake are involved in this case - including the one critical feature that has resulted in some courts refusing to give effect to a "true" Drake settlement agreement..

agreement) allowed the primary carrier to pay an amount in settlement that was less than the limits of the primary policy - most likely as an inducement to get the primary carrier to settle. As will be discussed later, it is this feature that is the most controversial and the primary reason why some courts have not enforced Drake/Loy settlements.

Before addressing what the North Dakota Supreme Court would likely conclude, it is helpful first to consider the decisions of other courts that have enforced settlement agreements in which an injured party has been allowed to divide his or her claim against the tortfeasor into two parts in order to allow a partial settlement of one part with the tortfeasor and the primary carrier and, with respect to the other part, preserve a claim against the tortfeasor for amounts in excess of the primary coverage that would be collectible only from the proceeds of the excess coverage. While the settlements in most of the cases that have addressed the issue have gone beyond the one here and allowed the primary carrier to pay less than its limits, the reasons expressed in those cases for why partial settlements with the primary carrier should be given effect have even more force in this case where the primary carrier did pay its limits. In addressing the cases from other jurisdictions, the court will spend more time on those from Wisconsin and Minnesota given the North Dakota Supreme Court's past reliance upon decisions from those states in construing and giving effect to settlement agreements in the tort context, as discussed later.

### 2. The Minnesota and Wisconsin cases

While the settlement agreement in this case makes explicit reference to Drake, the settlement agreement in Drake in similar fashion stated it was patterned after those upheld in the Wisconsin cases of Loy and Teigen. Because the Minnesota courts have looked to both Loy and Teigen for guidance, the court will start with those cases.

In <u>Loy</u>, the plaintiff, in a "special release," released defendant and defendant's primary insurer in exchange for payment of an amount less than the primary coverage, but reserved a claim claim based on defendant's purported negligence for any amount that might be recovered in excess of the primary limits but not more than the limits of the excess coverage. Notwithstanding the agreement's use of the word "release" and the fact that the agreement relieved the defendant of any further personal liability, the Wisconsin Supreme Court gave effect to the agreement and allowed suit to proceed against the excess carrier on the reserved claim. Unlike Minnesota and North Dakota, however, Wisconsin had a "direct action" statute that allowed the plaintiff to sue the carrier providing the secondary coverage directly. 320 N.W.2d at 184-92.

In <u>Teigen</u>, the Wisconsin Supreme Court addressed whether what it characterized as a "Loy Release/Covenant Not to Sue" could be given effect when the reserved claim was against an insurer providing umbrella coverage as opposed to coverage that simply was secondary, such as was the situation in <u>Loy</u>. In describing the release in <u>Teigen</u>, the court stated:

> The "Loy Release/Covenant Not To Sue" was specifically based on this court's decision in <u>Loy v. Bunderson</u>, 107 Wis.2d 400, 320 N.W.2d 175 (1982). Briefly, the release in this case provides for the partial release of Jelco and Schilling [the employer of the tortfeasor and the tortfeasor respectively] up to $500,000 and for any amounts in excess of Mission's [the excess carrier's] $2,000,000 coverage. Additionally, it provides for the release of Rural [the primary carrier] from all liability. Finally, although the release reserves any claims the plaintiffs may have against Mission up to the limit of Mission's policy, any potential recovery against Mission will be credited in the amount of $500,000—the limit of Jelco's primary coverage with Rural.

367 N.W.2d at 808. The Wisconsin Supreme Court then proceeded to conclude that the fact the coverage in <u>Teigen</u> was umbrella coverage did not make a difference because the fundamental reason why the court had given effect to the settlement agreement in <u>Loy</u> was the desirability of encouraging settlements and providing a mechanism for resolving cases, even if only partially, when a tortfeasor

had both primary and excess insurance coverage.  More particularly, the court stated:

> Returning to the case at hand, Mission argues that <u>Loy</u> is inapplicable here because, unlike Travelers' policy in <u>Loy</u>, Mission's policy with Jelco is a true excess insurance policy. Mission contends that Jelco's premium was set and its policy was written based on the coverage afforded to Jelco by Rural. Mission maintains that the premium was calculated with the expectation that the cost of defense of any claim would be borne by Rural, the primary carrier. This being the case, Mission believes that it would be grossly unfair to allow Rural to pay less than its policy limit of $500,000, thus forcing Mission to take over the defense of this action.
>
> After a review of our reasoning in <u>Loy</u>, we conclude that Mission's argument is without merit and that the distinction between Travelers' policy in <u>Loy</u> and Mission's policy in this case is a distinction without a significant difference. We, therefore, hold that the trial court correctly applied our decision in <u>Loy</u> in dismissing Rural from this action.
>
> If the issue of the existence of a true primary/excess insurance situation had been fundamental to our reasoning behind the <u>Loy</u> principle, then our holding in <u>Loy</u> would not control in the present suit. However, that is not the case. The rationale behind our affirmance of the "Loy Release/Covenant Not To Sue" is not anchored to the issue of whether a true primary/excess insurance situation exists. *The desirability of <u>Loy</u>-type agreements lies in the encouragement of partial settlements in future cases, thereby fostering effective and expeditious resolution of lawsuits. Partial settlements not only benefit the parties involved, but the justice system as a whole. Further, we reemphasize that "public interest requires that a plaintiff be permitted to settle claims against some of the exposed parties without releasing others."* <u>Id.</u> at 425, 320 N.W.2d 175. <u>Accord</u>, <u>Pierringer v. Hoger</u>, 21 Wis.2d 182, 124 N.W.2d 106 (1963), and <u>Swanigan v. State Farm Ins. Co.</u>, 99 Wis.2d 179, 299 N.W.2d 234 (1980).

<u>Id.</u> at 809-10 (italics added).

Turning to the seminal Minnesota decision in <u>Drake</u>, the plaintiff in that case had sued the defendant for injuries sustained in an automobile accident.  The defendant had $30,0000 in coverage under a policy on the automobile and $50,000 in "non-owned automobile coverage" under a policy issued to defendant's parents that the insurer claimed was secondary. The plaintiff and defendant attempted to reach a global settlement for an amount in excess of the primary coverage.  But, when the carrier providing the secondary coverage refused to participate in the discussions, the plaintiff, defendant, and primary insurer reached the agreement set forth earlier where plaintiff released his claim against the defendant and the primary insurer for liability up to the amount of the primary

policy in exchange for a payment less than the primary limits and reserved a claim against the defendant to pursue additional damages, but only to the extent of satisfying any amounts recovered from the excess coverage and not from defendant's personal assets. Drake, 514 N.W.2d at 786-87.

The carrier providing the secondary coverage in Drake contended that the plaintiff's claim could not be divided into two parts, particularly when the tortfeasor had effectively been relieved of any personal liability by the agreement not to execute against his personal assets and the primary carrier had paid less than its policy limits. In addressing the question of whether plaintiff's claim could be so divided and the tortfeasor relieved of any further personal responsibility, the Minnesota Supreme Court noted that it had upheld settlement agreements in the past that had dissected a plaintiff's claim into different parts as well as settlements where a plaintiff had agreed to satisfy a judgment only from the proceeds of an insurance policy and not from the defendant's personal assets. Id. at 788. Particularly relevant are two of the types of settlements that were referenced by the court: a Miller v. Shugart settlement, which derives its name from the Minnesota Supreme Court's decision in Miller v. Shugart, 316 N.W.2d 729 (Minn.1982), and a Pierringer release, which is named after the Wisconsin Supreme Court's decision in Pierringer v. Hoger, 124 N.W.2d 106 (Wis. 1963). This is because the North Dakota has adopted both as reflected by the cases cited infra.

After concluding that the division of plaintiff's claim into two parts and the agreement not to execute against defendant's personal assets were not impediments, the Minnesota Supreme Court next considered in Drake whether the settlement agreement, which expressly stated it was patterned after the one approved by the Wisconsin Supreme Court in Loy, could be given effect because Minnesota did not have a "direct action" statute like Wisconsin. The court held it did not make a difference because the defendant remained a real party in interest notwithstanding the agreement not

to pursue the defendant's personal assets. <u>Drake</u>, 514 N.W.2d at 788.

Finally, after discussing why the settlement agreement could be given effect, even though the parties had settled with the primary carrier for less than the primary limits - a point not relevant in this case, the Minnesota Supreme Court concluded that, with there being no explicit bar under Minnesota law to the settlement in that case, public policy supported giving it effect. The reasons why, according to the court, were that a settlement agreement of this kind helps promote settlement and simplify the remaining litigation. <u>Id.</u> at 788-89.

While <u>Drake</u> did not involve umbrella coverage, the Minnesota Court of Appeals subsequently applied the reasoning of <u>Drake</u> in a case where it was in <u>Cincinnati Ins. v. Franck</u>, 644 N.W.2d 471 (Minn. Ct. App. 2002). And, just as the Minnesota Supreme Court had looked to <u>Loy</u> for guidance in <u>Drake</u>, the Minnesota Court of Appeals looked <u>Teigen</u>, which had applied <u>Loy</u> to a case involving umbrella coverage. After quoting from a portion of <u>Teigen</u> set forth earlier, the court in <u>Franck</u> stated:

> We conclude that the <u>Teigen</u> rationale mirrors that of <u>Drake</u>, and that the public policy considerations of <u>Drake</u> and <u>Teigen</u> are identical. Certainly, the effective and expeditious resolution of lawsuits is a commendable goal; one fully consistent with the public policy of Minnesota. Indeed, as noted by the district court in this case, Minnesota has a history of approving and encouraging partial settlements of claims. <u>See Frey v. Snelgrove</u>, 269 N.W.2d 918, 921-22 (Minn.1978); <u>Kellen v. Mathias</u>, 519 N.W.2d 218, 223 (Minn.App.1994); <u>Klimek v. State Farm Mut. Auto. Ins. Agency</u>, 348 N.W.2d 103, 106 (Minn.App.1984).

644 N.W.2d at 475.

### 3. Cases from other jurisdictions

Minnesota and Wisconsin are not the only states in which courts have given effect to a partial settlement with a primary carrier. There are a number of decisions in which courts have enforced against an excess carrier settlements in which an injured party has: (1) released a portion of a claim

against a tortfeasor so as to permit a settlement with one insurance carrier, and (2) retained the right to proceed against the tortfeasor with respect to the remainder of the claim but limited to the proceeds available from the other insurance. See, e.g., Rummel v. Lexington Ins. Co., 945 P.2d 970, 981 (N.M. 1997); Smit v. State Farm Mut. Auto Ins. Co., 525 N.W.2d 528, 533 (Mich. Ct. App. 1994); Allstate Ins. Co. v. Riverside Ins. Co. of America, 509 F. Supp. 43, 45-48 (E.D. Mich. 1981); Gasquett v. Commercial Union Ins. Co., 391 So.2d 466 (La. Ct. App. 1980); Deblon v. Beaton, 247 A.2d 172, 174-76 (N.J. Super. Ct. 1968) Stargatt v. Fidelity & Cas. Co. of New York, 67 F.R.D. 689, 90-91 (D. Del. 1975). The primary reason expressed in almost all of these cases is that public policy favors settlements. See id.

To be sure, there are cases where courts have not enforced partial settlements with a primary carrier against an excess carrier. But, almost all of the cases were of the "true" Drake/Loy variety where the primary carrier was permitted to pay less than its policy. And, the reason in most of the cases for why the settlements were not enforced against the excess carrier was not the fact of the partial settlement with primary carrier or even the limiting of any further recovery to the coverage provided by the excess carrier. Rather, it was because of language in the excess policy that was construed as requiring payment by the primary carrier of its full limits as a condition precedent to the excess coverage being available. See, e.g., Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London, 73 Cal. Rptr. 3d 770, 777-85 (Cal. Ct. App. 4th Div. 2008); Comerica v. Zurich American Ins. Co., 498 F. Supp. 2d 1019, 1026-34 (E.D. Mich. 2007); but see United States Fire Ins. Co. v. Lay, 577 F.2d 421, 423 (7th Cir. 1978) (while the partial settlement was for an amount less than the limits of the primary policy, the court expressed other concerns about the settlement aside from that fact); see generally John F. O'Conner, Caveat Settlor:  Insurance Coverage Settlements and the

Triumph of Policy Language Over Precedent, 79 Alb. L. Rev. 101, 122-29 (2015-2016) ("Caveat Settlor") (discussing the cases and noting that over time the policy language in many excess policies has been further refined to make more explicit that full payment by the primary carrier is condition precedent to coverage under the excess policy).

### 4. What the North Dakota Supreme Court would likely conclude

#### *a. Public policy favors settlements of the kind involved in this case*

Turning then to this case, the North Dakota Supreme Court would likely conclude that an injured party can divide his or her claim into two parts in the situation where the tortfeasor has both primary and excess insurance coverage in order to facilitate a partial settlement among the injured party, the tortfeasor, and the primary carrier and allow a reserved claim to proceed for amounts in excess of the primary policy that is satisfiable only from the excess coverage - at the least when the primary carrier pays the full amount of the primary policy limits. The reasons why this conclusion is likely to be reached are twofold. First, is the strong preference under North Dakota law for settlement over litigation. The second is that there is nothing about North Dakota law that specifically prohibits this type of settlement.

In North Dakota, there is a strong preference for settlements that resolve disputes without judicial intervention. As explained by the North Dakota Supreme Court:

> Because litigation is considered injurious to society, compromises which diminish litigation and promote a peaceful society are favored. Thus, there is a public policy in this state to encourage settlements and to discourage litigation.

North Dakota Workers Compensation Bur. v. General Inv. Corp., 2000 ND 196, ¶ 19, 619 N.W.2d 863. And here, the North Dakota Supreme Court is likely to find persuasive the conclusion reached by others that a settlement with the particular features described above advances this policy because

it provides a mechanism for achieving settlement, albeit a partial one, when a tortfeasor has both primary and excess coverage.[6] Cf. Wangler v. Lerol, 2003 ND 164, ¶¶ 21-23, 670 N.W.2d 830 (noting that the North Dakota Supreme Court has embraced Miller v. Shugart settlement agreements and the policy reasons expressed in Miller v. Shugart, 316 N.W.2d 729 (Minn.1982) for why such settlement agreements should be given effect); Bartels v. City of Williston, 276 N.W.2d 113 (N.D. 1979) (embracing Pierringer releases as recognized by the Wisconsin and Minnesota courts in part because they advance the policy of the underlying statutory scheme of encouraging settlements).

While the North Dakota Supreme Court is likely to conclude this is reason enough, it is likely to also find persuasive an argument that, for the parties involved in a particular case, the benefits to the settling parties outweigh any negative consequences for the non-settling excess carrier. In that regard, the benefits to the settling parties are clear. The tortfeasor gets out from under the possibility of a ruinous judgment beyond the excess coverage, which, in this case, was more than a remote possibility if there was substantial fault on the part of the Defendants given the extent of Brock's injuries. The primary insurer is relieved of its continuing obligation to defend and also avoids a claim that by not settling it acted in bad faith. Allstate Ins. Co., 509 F. Supp. at 46-47 (discussing the duties of the primary insurer and that the failure to settle could expose it to a claim of bad faith).[7]

_____

[6] If partial settlements with the primary carrier are not permitted, one commentator with substantial tort and insurance litigation experience has noted the following as being the consequence:

Any time a policyholder has both primary and excess insurance and faces a disputed claim that might exceed its primary insurance coverage, an issue arises as to whether the policyholder can settle with its primary and lower-layer insurers without forfeiting any attempt to pursue coverage from non-settling excess insurers. It makes it virtually impossible to settle large-scale insurance coverage disputes in a piecemeal fashion, and provides substantial leverage to excess insurers that may be able to benefit by holding out on group settlement efforts.

See Caveat Settlor, 79 Alb. L. Rev. at 103-04 & 125.

[7] The court in Allstate Ins. Co. stated:

If the primary carrier (Defendant) were to decline, perhaps feeling that the agreement might impair its obligation (vague as it may be) to the excess carrier, (Plaintiff), the estate may respond with

Finally, and what the North Dakota Supreme Court is likely to conclude is most compelling, is that the settlement provides a means whereby compensation can flow more quickly to the injured party.

On the other hand, the negative consequences to the excess carrier of a settlement agreement with the features of that in <u>this</u> case would appear to be: (1) the excess carrier would be put in position of having to incur the costs of defense that otherwise would be the responsibility of the primary carrier; and (2) the fact that it may not have the same degree of willing and "cheerful" cooperation of the insured it would have had if the insured not been relieved of any further personal responsibility.[8] And, while these consequences may not be *de minimus*, the North Dakota Supreme Court is likely to conclude that they do not outweigh the benefits that accrue to the settling parties

an additional incentive to the primary carrier. For instance, the estate may agree not to seek to satisfy any judgment rendered against the Rosses except out of the proceeds of any applicable insurance that is, agree not to obtain satisfaction from the personal estates of Rosses. Nothing improper nor violative of any law or public policy about this arrangement has been called to the Court's attention and the Court perceives no impropriety. At this point the primary carrier, may be caught between two competing duties: first, to the excess carrier and second, to the insured.[7] Assuming the primary carrier, after evaluating the estate's case, determines that it runs a substantial risk of having to pay the full $100,000 were the case to go to trial and feels that a $75,000 payment is justified because of that risk, it may then find, in the face of the estate's offer to not pursue the insureds personally, that it has a duty to protect its insured by entering into the settlement thereby eliminating the insureds' exposure to personal liability. Thus, the primary carrier may enter into the agreement.

What is wrong with that evaluation by the primary carrier? Is it not sufficient that the primary insurer keep the excess insurer informed of the negotiations and provide it with the opportunity to participate in those negotiations? Why should the primary carrier be required to pursue its somewhat questionable duty to the excess carrier by rejecting the settlement, thus subjecting the insureds to personal liability? Would it not subject the primary carrier to a claim of bad faith by its insured if a judgment were ultimately rendered against the insured in excess of all applicable insurance coverages? Where is it written that the duty of a primary carrier is greater to the excess carrier than it is to its own insured? To ask these questions is to answer them.

509 F. Supp. at 46-47 (footnote omitted).

[8] Critics of "true" <u>Drake</u>/<u>Loy</u> settlements point to what they believe are additional negative consequences that flow to the excess carrier when the primary carrier is allowed to pay less than the primary limits and focus upon these consequences as being the reasons for why such settlements should not be given effect. One is a concern that, by allowing the primary carrier to settle for less than the policy limits, this allows the "trigger" for the excess coverage to be reached quicker and more often , thereby affecting the economics of the limited coverage that the excess carriers intended to provide. There is also a concern that there is a greater potential for mischief and collusion to the disadvantage of the excess carrier. <u>See generally</u> John F. O'Conner, <u>Insurance Coverage Settlements and the Rights of Excess Insurers</u>, 62 Md. L. Rev. 30 (2003). Of course, these potential negative consequences are less when, as in this case, the primary carrier pays its limits

and particularly are not enough when the benefits to the public of promotion of settlements and conservation of judicial resources are also considered. Notably, the excess carrier can mitigate the consequence of having to incur the costs of defense in cases where it may have some exposure by also settling. Also, with respect to the possibility of an uncooperative insured, the tortfeasor may in some cases have other reasons to cooperate with the excess carrier, as pointed out by the Minnesota Supreme Court in Drake. But, even if not in a particular case, the tortfeasor will have to testify, either voluntarily or by way of subpoena, if the excess carrier wants the testimony, and we do not start with the presumption that persons who take an oath to testify truthfully will not do so. See Allstate Ins. Co., 509 F. Supp. at 48.[9] Finally, the mere fact that the excess carrier will be put in a more difficult situation and may have to make tough choices was not enough for the North Dakota Supreme Court to conclude, for example, that Miller-Shugart settlements should not be given effect. The court is likely to reach the same conclusion here.[10]

        *b.*     *North Dakota law does not prohibit settlements with the features of the one in this case*

---

[9] In Allstate Ins. Co., the court stated the following in response to the concern that the excess carrier may be deprived of honest and truthful testimony of an insured who no longer has any personal exposure:

> In any event, the insured is obligated to testify honestly. The possibility of fraud by the insured is identical to the possibility of fraud in any other case. It must be emphasized that the fear or possibility of fraud is not sufficient to bar a claim or invalidate any otherwise valid settlement [citation omitted].

Id. at 48.

[10] Also, allowing an injured party to divide his or her claim and settle part is not always disadvantageous to an excess carrier. There may be situations where the excess carrier providing an intermediate layer of coverage may wish to participate in a settlement that absolves it of any liability and obligation to defend in situations where insurers with higher levels of excess coverage are unwilling to settle. See, e.g., Miller v. Gorski Wladyslaw Estate, 338 Fed.Appx. 454 (9th Cir. 2009) (intermediate excess carrier participating in the settlement); Rummel v. Lexington Ins. Co., 945 P.2d 970 (N.M. 1997) (same). Also, there may be situations where an excess carrier might want to reach a settlement with the injured party and the tortfeasor in a situation where there is a recalcitrant primary insurer. See, e.g., Dennis J. Wall, Litigation & Prevention of Insurer Bad Faith § 3.20 (3d ed. last updated July 2016) (discussing these possibilities). Finally, while the court need not decide now, the fact the tortfeasor is protected personally arguably eliminates (or at least substantially lessens) the exposure of an excess carrier to a claim of bad faith because of the fact that the tortfeasor will have suffered little or no damage. See id.

The North Dakota Supreme Court is also unlikely to agree with defendants' contention that settlements with features of the one in this case violate North Dakota law. One of the arguments that defendants make is that the settlement in this case is contrary to past decisions of the North Dakota Supreme Court that do not allow direct actions against liability insurers providing coverage to third parties.

As defendants correctly point out, North Dakota does not have a direct action statute allowing an injured party to maintain an action against an insurer. In such absence, the North Dakota Supreme Court has generally not allowed injured parties to maintain direct actions at common law. Shermoen v. Lindsay, 163 N.W.2d 738, 745 (N.D. 1968); but see James v. Young, 43 N.W.2d 692 (N.D. 1950) (allowing joinder of an insurer in a negligence action against an insured). The court has not done so for two reasons. First, the court has concluded an injured party generally cannot be considered an intended claimant or third-party beneficiary under an insurance contract. Shermoen, 163 N.W.2d at 744. Second, the court has observed that other "[c]ourts seem to be fearful of undue jury liberality in a negligence suit where the carrier is joined as a defendant." Id. As a result, "[a]bsent a clause in the insurance contract bestowing the right to bring a direct action against the insurer, an injured party's claim must be asserted against the tortfeasor, not the tortfeasor's insurer." Dvorak v. Am. Family Mut. Ins. Co., 508 N.W.2d 329, 331 (N.D. 1993).

The problem with defendants' argument, however, is that the settlement agreement in this case does not authorize an injured party to proceed directly against an insurer. In reserving a claim against the insured, but only to the extent of available insurance proceeds, an injured party is still required under the agreement to get a judgment against the tortfeasor to get to the excess insurer. Also, even putting that aside, the North Dakota Supreme Court is likely to conclude that such

settlements do not do great violence to the reasons it has articulated for not allowing direct actions. The agreement here does not confer intended claimant or third-party beneficiary status upon an injured party. Also, because the defendant tortfeasor remains the named defendant, the excess insurer retains some protection against potential prejudice from "jury liberality" that was of concern in Shermoen. And, while that protection may be eroded to a degree by the covenant not to execute against the defendants' personal assets, the North Dakota Supreme Court is unlikely to conclude that this is a "deal breaker" for the reasons previously articulated. In summary, the North Dakota Supreme Court is likely to agree with the Minnesota Court of Appeals in Drake that the fact governing law "does not permit direct action against liability insurers is of no consequence," 498 N.W.2d at 33, and the implicit conclusion of the Minnesota Supreme Court that, given the retention of the tortfeasor as a named party and the fact that the tortfeasor's fault must still be adjudicated, the settlement has not turned the action into a *de facto* direct action against the excess carrier, 424 N.W.2d at 788-89.

Defendants' other argument for why the settlement agreement cannot be given effect is their contention that a covenant not to execute amounts to a release as a matter of law thereby extinguishing the claim the court has concluded the settling parties in his case attempted to reserve. The North Dakota Supreme Court appears to have resolved this point in Wangler v. Lerol, 2003 ND 164, 670 N.W.2d 830, albeit in the different, but yet analogous, context of a Miller-Shugart settlement agreement. In that case, the North Dakota Supreme Court noted that nationwide there is a division of authority with respect to whether a covenant not to execute is tantamount to a release as a matter of law or should be treated as a functional equivalent. Adopting what it characterized as the majority position, the court expressly concluded that a covenant not to execute is not the equivalent of a

release, noting that it had implicitly so held in numerous cases upholding <u>Miller-Shugart</u> settlements in the past, a central feature of which is a covenant not to execute and which, if construed to be a release, would render such settlements unenforceable *ab initio*. <u>Id.</u> at ¶¶ 17-23.

>   c.   *The North Dakota Supreme Court's past reliance upon Minnesota and Wisconsin cases in adjudicating tort settlements*

While the court's prediction that the North Dakota Supreme Court would give effect to any claim Brock has preserved against the defendants is based on the reasons set forth above, what also lends support for the prediction is the fact that the North Dakota Supreme Court in the past has looked to Minnesota and Wisconsin cases for guidance in the area of tort settlements. <u>See</u>, <u>e.g.</u>, <u>Hanneman</u>, 1998 ND 46, at ¶41 (observing that the "concept known as a <u>Miller-Shugart</u> agreement crossed the Red River from Minnesota and became part of our case law."); <u>Sellie v. North Dakota Ins. Gaur. Ass'n</u>, 494 N.W.2d 151, 150-60 (N.D. 1991) (relying upon the "well considered Minnesota analysis" of the Minnesota Supreme Court in <u>Miller v. Shugart</u> in giving effect to the settlement agreement at issue); <u>Bartels</u>, <u>supra</u>, (citing both Minnesota and Wisconsin case law with respect to <u>Pierringer</u> releases).

## III.   ORDER

Based on the foregoing, defendants' motion to dismiss (Docket No. 7) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 25th day of January, 2017.

>   */s/  Charles S. Miller, Jr.*
>   Charles S. Miller, Jr., Magistrate Judge
>   United States District Court